**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ADTILE TECHNOLOGIES INC.,      )
                                   )
         Plaintiff,          )
                                   )
         v.            )      Civil Action No. 15-1193-SLR
                                   )
PERION NETWORK LTD. AND      )      REDACTED - PUBLIC VERSION
INTERCEPT INTERACTIVE, INC. DBA    )
UNDERTONE,                   )
                                   )
         Defendants.        )

**OPENING BRIEF IN SUPPORT OF PLAINTIFF ADTILE TECHNOLOGIES INC.'S
MOTION FOR PRELIMINARY INJUNCTION**

MORRIS NICHOLS ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
302.351.9219
dreid@mnat.com

*Attorneys for Plaintiff Adtile Technologies Inc.*

OF COUNSEL:

Greg L. Lippetz (Bar No. 154228)
Admitted Pro Hac Vice
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
650.739.3968
glippetz@jonesday.com

February 3, 2016
Redacted Filing Date:  February 5, 2016

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................. 2

     A.    Adtile's Motion Ad Technology And Associated Intellectual Property Rights ......................................................................................................... 2

     B.    Undertone Seeks Out Adtile's Motion Ads ..................................... 4

     C.    The Parties Enter Into A License Agreement .................................... 4

     D.    Disclosure Of Adtile's Trade Secret And Confidential Information ................... 5

     E.    Perion Shows Interest In Adtile .............................................................. 6

     F.    Termination Of The Parties' Agreement ............................................ 7

     G.    Undertone's Misappropriation And Passing Off Of Adtile's Intellectual Property ......................................................................................... 7

     H.    Defendants' Continued Misappropriation And Passing Off Of Adtile's Intellectual Property ............................................................... 9

III.    ARGUMENT ..................................................................................................... 10

     A.    Adtile Is Entitled To A Preliminary Injunction ................................. 10

          1.    Adtile Is Likely To Prevail On The Merits ............................ 10

              (a)    Delaware Statutory Misappropriation of Trade Secrets ............... 11

              (b)    Common Law Misappropriation of Confidential Information ................................................................. 13

              (c)    Copyright Infringement ............................................... 14

              (d)    False Designation of Origin and Unfair Competition ................. 15

          2.    Adtile Is Threatened With Irreparable Harm ........................... 17

          3.    The Balance Of Hardships Favors Injunctive Relief .............. 18

          4.    The Public Interest Favors Grant Of A Preliminary Injunction ............. 19

          5.    The Bond Should Be Excused or Set at a Nominal Amount .................. 20

IV.    CONCLUSION .................................................................................................. 20

## TABLE OF AUTHORITIES

**Page**

CASES

*Air Prods. & Chem. v. Inter-Chem. Ltd.*,
  No. 03-CV-6140, 2003 U.S. Dist. LEXIS 23985 (E.D. Pa. Dec. 2, 2003)..................12, 18, 19

*AMC Tech. L.L.C. v. SAP AG*,
  78 U.S.P.Q.2d 1834, 2005 U.S. Dist. LEXIS 27095 (E.D. Pa. Nov. 3, 2005) ........................15

*Apple Comput., Inc. v. Franklin Comput. Corp.*,
  714 F.2d 1240 (3d Cir. 1983)..................................................................................................19

*AT&T v. Winback & Conserve Program*,
  42 F.3d 1421 (3d Cir. 1994)....................................................................................................16

*Bimbo Bakeries USA, Inc. v. Botticella*,
  613 F.3d 102 (3d Cir. 2010)....................................................................................................19

*Blendingwell Music, Inc. v. Moor-Law, Inc.*,
  612 F. Supp. 474 (D. Del. 1985)..............................................................................................14

*CryoLife, Inc. v. CR Bard, Inc., et al.*,
  No. 14-559-SLR, 2015 U.S. Dist. LEXIS 29460 (D. Del. Mar. 10, 2015) .............................17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991).................................................................................................................14

*Groupe SEB U.S., Inc. v. Euro-Pro Operating LLC*,
  774 F.3d 192 (3d Cir. 2014).....................................................................................................18

*Home Line Furniture Indus. v. Banner Retail Mktg.*,
  LLC, 630 F. Supp. 2d 527 (E.D. Pa. 2009).......................................................................10, 19

*McKesson Automation, Inc. v. Swisslog Holding AG*,
  No. 06-28-SLR-LPS, 2009 U.S. Dist. LEXIS 103665 (D. Del. Oct. 30, 2009) .....................13

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002).....................................................................................................17

*Premier Dental Prods. Co. v. Darby Dental Supply Co.*,
    794 F.2d 850 (3d Cir. 1986)............................................................................17

*Research Found. of State Univ. of N.Y. v. Mylan Pharms., Inc.*,
    723 F. Supp. 2d 638 (D. Del. 2010)..............................................................17

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
    968 F.2d 371 (3d Cir. 1992)............................................................................10

*Thomas & Betts Corp. v. Richards Mfg. Co.*,
    342 F. App'x 754 (3d Cir. 2009) ...................................................................13

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    342 F.3d 191 (3d Cir. 2003)............................................................................10

*Whelan Assocs. v. Jaslow Dental Lab., Inc.*,
    797 F.2d 1222 (3d Cir. 1986).........................................................................14

*Williams v. Curtiss-Wright Corp.*,
    681 F.2d 161 (3d Cir. 1982)............................................................................18

**STATUTES**

6 Del. C. § 2001(1) ................................................................................................12

6 Del. C. § 2001(2) ................................................................................................12

6 *Del. C.* §§ 2001-2009.........................................................................................11

6 Del. C. § 2002(a)................................................................................................18

15 U.S.C. § 1116(a) ..............................................................................................18

15 U.S.C. § 1125(a)(1)(A) ....................................................................................16

17 U.S.C. § 106 .....................................................................................................15

17 U.S.C. § 410(c) ................................................................................................14

17 U.S.C. § 502(a) ................................................................................................18

15 U.S.C. § 1125(a) ..............................................................................................15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(c) ...............................................................................................................20

www. Perion.com...................................................................................................................9

## I.      <u>INTRODUCTION</u>

Plaintiff Adtile Technologies Inc. ("Adtile") is the creator of "Motion Ads," a revolutionary method of mobile device advertising that engages users with a unique motion-activated advertising experience.  Designed to take advantage of a mobile devices' GPS, gyroscope, motion coprocessor, accelerometer and digital compass, Motion Ads respond to users' motions and gestures, such as tilting, shaking or twisting mobile devices, resulting in a substantial increase in user engagement rate and ad viewership time.

Appreciating the innovative nature of Motion Ads and the considerable advantages this technology would have for its clients, Defendant Intercept Interactive, Inc. dba Undertone ("Undertone"), a digital advertising firm, entered a license agreement with Adtile to enable Undertone to sell Adtile's technology to its advertising clients.  However, as later became clear, Undertone's true intent was to appropriate Adtile's technology and pass the technology off as its own.  After obtaining enough of Adtile's trade secret and proprietary information to allow Undertone to create and sell its own motion-activated ads, Undertone sought to terminate the parties' license agreement.

Undertone, having admitted it had no experience with motion-activated technology before obtaining Adtile's intellectual property, began selling its own shockingly similar ads immediately after the termination of the parties' license agreement.  Not only did Undertone's copycat ads utilize Adtile's proprietary ornamentation, layout, and user experiences, they prominently displayed Adtile's copyrighted "handphone" image, further misleading consumers as to the source of the ads.  Since Undertone's acquisition by Perion Network Ltd. ("Perion"), this misappropriation has continued, causing irreparable harm to Adtile.

Adtile submits this memorandum in support of its motion for preliminary injunction to enjoin Defendants Perion and Undertone ("Defendants") from further misappropriation and use

of Adtile's confidential and trade secret information and its "handphone" image.   The preliminary injunction is warranted because Adtile is highly likely to prevail on the merits of its complaint, and Adtile faces immediate and irreparable harm due to Defendants' conduct.  Adtile therefore respectfully requests that this Court enter the requested preliminary injunctive relief.

## II.    STATEMENT OF FACTS

### A.    Adtile's Motion Ad Technology And Associated Intellectual Property Rights

Adtile's Motion Ads transform mobile advertising by providing an advertising format that embraces the mobile user's quest for entertainment and discovery and offers advertisers superior brand engagement.  Declaration of Nils Forsblom ("Forsblom Decl.") ¶ 6.  Motion Ads allow users to physically interact with ads by motions such as tilting, twisting, or drawing a design, and then respond to the user's kinetic motion with visual and audio effects.  *Id.* at ¶ 7. Adtile was the first company in the world to introduce a rich media product with its own design and development guidelines, design constraints, and quality control instructions, all of which are required to ensure the sensor-enabled motion experiences of Motion Ads properly function.  *Id.* at ¶ 8.   Since the introduction of Motion Ads, Adtile has received global recognition for innovation and massive praise from mobile advertising industry leaders.  *Id.* at ¶ 18.  Motion Ads have been described as "the next advertising revolution," "totally reinvent[ing] the mobile ad experience," "hot stuff," and "beyond proprietary."  *Id.* at ¶ 19, Exh. D.

Adtile's creation and development of Motion Ads resulted from significant investments of time and money.  Forsblom Decl. ¶¶ 15-16.  Starting in 2013 with five full-time engineers, Adtile's team has since grown to twelve full-time engineers, all of whom work exclusively on Motion Ads, and often in excess of 40 hours per week.  *Id.* at ¶ 15.   The research and development of Motion Ads took over 100,000 man hours, and included testing on over 50

different mobile devices.  *Id.* at ¶ 11.  Adtile also secured investments of over $7 million to develop and launch Motion Ads in the marketplace.  *Id.* at ¶ 16.

Motion Ads consist of  all of which comprise Adtile trade secrets.  Forsblom Decl. ¶¶ 9, 22.

Due to these unique elements, Motion Ads have had a tremendous impact on the mobile advertising community, with the result that consumers who interact with a traditional mobile phone ad for an average of 1-3 seconds engage with Motion Ads for an average of more than 20 seconds.  *Id.* at ¶ 17.

In addition to the foregoing trade secret and confidential information which Adtile possesses in its Motion Ads, Adtile owns a copyright registration, a pending trademark application, and common law trademark rights in its proprietary "handphone" image, shown below, which is used to indicate that Adtile is the source of Motion Ads.  Forsblom Decl. ¶ 21, Exhs. F & G.



In connection with its Motion Ads, Adtile also uses a family of "Motion" trademarks, which customers identify with Adtile. *Id.* at ¶ 20, Exh. E.

### B.   Undertone Seeks Out Adtile's Motion Ads

Adtile's Motion Ads have enjoyed enormous critical acclaim and commercial success. Forsblom Decl. ¶¶ 17-19, Exh. D.   Undertone recognized and sought to capitalize on this success.   On February 14, 2014, Undertone reached out to Adtile, expressing an interest in Adtile's Motion Ad technology. *Id.* at ¶ 24.   At the time, Undertone's employees represented to Adtile that they had never before done a motion-activated mobile advertisement, had no knowledge of motion-activated advertising technology, and were eager to license Adtile's technology for the revolutionary Motion Ads. *Id.*

Believing Undertone's interest in its technology was in good faith, on March 31, 2014, Adtile entered into a Non-Disclosure Agreement ("NDA") with Undertone, ████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████ Forsblom Decl. ¶ 24, Exh. I.  Only after the NDA was executed did Adtile begin to share its trade secrets and proprietary know-how with Undertone. *Id.* at ¶ 25.

### C.   The Parties Enter Into A License Agreement

On August 18, 2014, the parties executed a Services and Software License Agreement ("License Agreement"), along with a new NDA.  Forsblom Decl. ¶ 26, Exh. J.  Because Adtile's Motion Store ████████████████████████████ which allows users to create Motion

Ads using Adtile's technology—was still in development at this time, Adtile agreed to teach

Undertone how to directly create Motion Ads with the object code of the licensed software until

the Motion Store was up and running.  *Id.* at ¶ 26.

Under the License Agreement, ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████

### D.      Disclosure Of Adtile's Trade Secret And Confidential Information

Over the next nine months, Adtile began to teach Undertone ████████████████

████████████████████████████████████████████████ beginning with a

multi-day training session for key Undertone sales, business development, design, and software

development employees.    Forsblom Decl. ¶ 30.    During the training, Adtile shared its

confidential and trade secret information with Undertone employees pursuant to the NDA.  *Id.*

Undertone employees were provided a password and URL to access Adtile's source code which

they used to build Motion Ads, as well as confidential documents that provided step-by-step

instructions to designers and developers on how to design and build Motion Ads from the ground

up.  *Id.*

As Undertone was being provided all of this confidential information, it was already looking for a way to take full credit for these ads. During a break in the August 2014 training sessions, the Senior Director of Integrations at Undertone requested that Adtile notify Undertone first if it ever considered selling. Forsblom Decl. ¶ 34.

Following the training session, Adtile and Undertone employees engaged in numerous conversations regarding Motion Ads via "Basecamp," a secure platform for communications between the parties. Forsblom Decl. ¶ 35. These conversations generally consisted of Undertone employees asking Adtile employees whether certain functions were possible, and, where they were available, Adtile employees providing an explanation of how to accomplish the functions. *Id.* From August 2014 through June 2015, Adtile continued to disclose its trade secrets and proprietary know-how to Undertone, providing Undertone with nearly all of the proprietary information necessary to copy and produce Adtile's Motion Ads and thoroughly training them on how to develop, create, and sell Motion Ads. *Id.* ¶¶ 33, 36, 37.

In November 2014, Undertone requested an exclusive licensing deal with Adtile, but Adtile declined. Forsblom Decl. ¶ 40. From February to April 2015, Undertone placed only one new Motion Ad order with Adtile; however, Undertone continued to access the Basecamp and ask Adtile employees questions about features of the Motion Ads. *Id.*

### E.     Perion Shows Interest In Adtile

While working with Undertone, Adtile was also approached by Perion regarding Adtile's Motion Ads. Forsblom Decl. ¶ 38. The two parties considered a potential relationship in August of 2014 but no relationship developed at that time. *Id.* at ¶ 39. In June 2015, Perion once again reached out to Adtile, at which point Perion represented that it was looking to use and invest in Adtile's technology. *Id.* at ¶¶ 41-42. Perion inquired whether Adtile had heard of a company called "Undertone" and stated that Undertone was also doing these same types of motion-

activated ads with great success.  *Id.* at ¶ 42.  Adtile informed Perion that Undertone was in fact a client and the technology they were using was Adtile's.  *Id.*  After this call, the parties continued to look into a potential relationship, but nothing came of it.  *Id.*

**F.     Termination Of The Parties' Agreement**

In June 2015, Undertone expressed its desire to terminate the License Agreement.  Forsblom Decl. ¶ 43.  The Termination Agreement, signed on June 26, 2015, ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████     *Id.* at ¶ 44, Exh. K.

**G.     Undertone's Misappropriation And Passing Off Of Adtile's Intellectual
         Property**

Although Adtile invested nearly two years exclusively developing Motion Ads, immediately upon terminating the relationship, Undertone began selling copycat ads.  Adtile first discovered a motion-activated ad for Discover, which was shockingly similar to Adtile's Motion Ads.  Forsblom Decl. ¶ 45.  The Discover ad, developed by Undertone without Adtile's knowledge, includes Adtile's proprietary ornamentation, layout, and user experiences, and displays Adtile's "handphone" image. *Id.*, Exh. Q.

The timeline below describes Undertone's further misappropriation and infringement:

●     July 22, 2015:  Adtile discovered a video blog post by Undertone featuring the Nestlé Perrier Motion Ad that Adtile created for Undertone, which falsely represented that this Motion Ad was Undertone's alone.  Forsblom Decl. ¶ 46, Exh. R.

●     August 17, 2015:  Adtile found another motion-activated ad for Gerber developed by Undertone, using Adtile's copyrighted "handphone" image. *Id.* at ¶ 48.

● August 18, 2015:  Adtile discovered yet another motion-activated ad produced by Undertone, this time for L'Oreal, which uses Adtile's proprietary ornamentation, layout, and user experiences and the "handphone" image.  *Id.* at ¶ 49, Exh. T.

● September 10, 2015:  Adtile discovered another motion-activated ad by Undertone, this one for Wayward Pines.  *Id.* at ¶ 51.

● September 16-17, 2015:  Undertone attended a conference in Germany where it "launched a new product"—Adtile's Motion Ads, and used in its promotional materials an image Adtile had created for Undertone's sales presentations for Motion Ads.  *Id.* at ¶ 52, Exh. V.

● September 23, 2015:  Adtile found a "draw a heart in the air" demonstrative ad posted on Undertone's website, which utilized Adtile's proprietary information.  *Id.* at ¶ 56.

● October 1, 2015:  Adtile learned that Undertone received awards at the Mobile Media Summit based on the Nestlé Perrier Motion Ad that Adtile created (and for which, to Adtile's knowledge, Undertone accepted full credit).  *Id.* at ¶ 57.

● October 7, 2015:  Adtile discovered a motion-activated ad by Undertone, for Vita Coco, which displays Adtile's "handphone" image and utilizes Adtile's proprietary ornamentation, layout, and user experiences.  *Id.* at ¶ 59.

● June 2015 to October 2015:  Adtile received a number of complaints from prospective clients and others in the industry expressing confusion based on the Undertone ads.  *Id.* at ¶ 53.  For example, at a trade show in San Francisco, two different tradeshow attendees told employees at the Adtile booth that they had seen "Adtile's" Vita Coco ad.  *Id.*

● November 16, 2015:  Adtile found an Undertone motion-activated ad for Garmin, which again uses Adtile's proprietary ornamentation, layout, and user experiences.  *Id.* at ¶ 60.

**H.  Defendants' Continued Misappropriation And Passing Off Of Adtile's Intellectual Property**

After Perion was unsuccessful in lawfully obtaining Adtile's technology from Adtile, it obtained the technology unlawfully, by purchasing Undertone.  By way of a December 1, 2015 press release, Perion announced that it had acquired Undertone for $180 million.  Lippetz Decl. ¶ 2.  At the time of the acquisition, Perion knew or should have known that Adtile had sent several written demands to Undertone to cease and desist from using Adtile's intellectual property.

Perion continues to actively participate with Undertone in misappropriating Adtile's intellectual property.  By way of example, Perion has described the infringing Undertone mobile ads as part of its ad solutions, and part of the advertising products that Perion offers to its customers.  Lippetz Decl. ¶ 4.  On its website (www. Perion.com), Perion also refers to Undertone as "[o]ur digital ad firm."  *Id.* at ¶ 3.

Undertone and Perion have been producing and continue to produce mobile ads using Adtile's confidential and trade secret information and featuring Adtile's copyrights and trademarks.  Forsblom Decl. ¶ 61.  For example, in December 2015, Adtile discovered additional motion-activated ads by Defendants, including for Star Wars Gummy Vitamins, that display Adtile's "handphone" image, utilize Adtile's proprietary ornamentation, layout, and user experiences, and use Adtile's copyrighted Full Tilt Library.  *Id.* at ¶¶ 61-62, Exh. X.

To this day, Defendants continue to create motion-activated ads using Adtile's trade secrets, copyrights, and trademarks, in competition with Adtile, despite Adtile's demands that Undertone cease such use.  Forsblom Decl. ¶¶ 47, 64, Exh. S.  Without immediate intervention from this Court, Defendants will continue to misappropriate and infringe Adtile's intellectual property, leaving Adtile irreparably harmed.  *Id.* at ¶¶ 65-68.

III.   <u>ARGUMENT</u>

A.   **Adtile Is Entitled To A Preliminary Injunction.**

A preliminary injunction is necessary to prevent further misappropriation and infringement of Adtile's intellectual property.  A plaintiff is entitled to a preliminary injunction where it has demonstrated:  (1) a likelihood of success on the merits; (2) that plaintiff will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.  *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).  An evaluation of each of these factors demonstrates preliminary injunctive relief is warranted here.

Furthermore, injunctive relief is routinely granted where, as here, a licensee continues to develop, market, and sell a copycat product as their own after the termination of an agreement with the licensor.  *See, e.g., Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 207 (3d Cir. 2003) (affirming preliminary injunction against former licensee who created and sold unauthorized trailers after its agreement allowing it to sell authorized trailers was terminated); *Home Line Furniture Indus. v. Banner Retail Mktg.*, LLC, 630 F. Supp. 2d 527, 540-43 (E.D. Pa. 2009) (preliminarily enjoining defendant from selling a web-based program based on proprietary information disclosed to defendant pursuant to confidentiality agreements).

1.   **Adtile Is Likely To Prevail On The Merits.**

Adtile is likely to prevail on the merits of each of the claims alleged in its Complaint. For purposes of preliminary injunctive relief, Adtile focuses only on the causes of action demonstrating the need for immediate relief—those with facts that are most apparent now, even without the benefit of discovery, to be causing immediate and irreparable harm.  These claims include:   (a) Delaware statutory misappropriation of trade secrets, (b) common law

misappropriation of confidential information, (c) copyright infringement, and (d) Lanham Act false designation of origin and unfair competition.

**(a)       Delaware Statutory Misappropriation of Trade Secrets**

Adtile's proprietary information is protected as trade secrets under Delaware law and Defendants' conduct meets the definition of "misappropriation" under that law.  Specifically, under the Uniform Trade Secrets Act, in force in Delaware as 6 *Del. C.* sections 2001-2009, a "trade secret" is defined (*id.*, § 2001(4)) as:

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a.   Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b.   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The purloined Adtile trade secret information has independent economic value because it is not generally known or readily ascertainable by proper means.  Rather, the trade secret information took several years and hundreds of thousands of hours to develop.  Forsblom Decl. ¶¶ 11, 15-16.  Such trade secret information includes ████████████████████████ ████████████████████████ *Id.* at ¶¶ 10-13.

Moreover, Adtile's trade secret information is subject to significant efforts to maintain its secrecy, including ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Forsblom Decl. ¶ 22.  Based on these steps, Adtile's trade secret information qualifies for protection under Delaware statutory law.

Defendants' acts also meet the Delaware statute's definition of "misappropriation" of a trade secret, namely (6 Del. C. § 2001(2)):

> a.  Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[1]; or
>
> b.  Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> 1.  Used improper means to acquire knowledge of the trade secret; or
>>
>> 2.  At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: …
>>
>>> B.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; ….

First, in violation of the parties' agreements, Undertone disclosed and used—and continues to use—Adtile's trade secrets without Adtile's consent.   Based on the parties' agreements, Undertone knew at the time of the disclosure that the information constituted Adtile's trade secrets and that Undertone had a duty to maintain their secrecy and limit their use as specifically set forth in the agreements.  Forsblom Decl., Exh. I, ¶ 3.

The negligible period of time in which Defendants created and launched their copycat Motion Ads, after admitting to having no prior experience with motion-activated ads, and the conduct leading up to the termination of the parties' agreement belies any other conclusion than that Defendants used Adtile's trade secret information to create their ads.  *See Air Prods. & Chem. v. Inter-Chem. Ltd.*, No. 03-CV-6140, 2003 U.S. Dist. LEXIS 23985, at *31 (E.D. Pa. Dec. 2, 2003) (concluding plaintiff was likely to succeed on misappropriation claim because defendant was able to launch a line of competing products within a month of entering into an

---

[1] According to the statute:  "'Improper means' shall include theft, bribery, misrepresentation, breach r inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  6 Del. C. § 2001(1)).

agreement with plaintiff's former employee despite having never previously manufactured a similar product).  Furthermore, the questions asked by Undertone employees through Basecamp during the period when Undertone was not ordering ads from Adtile provide further support for the conclusion that Undertone was improperly acquiring and using Adtile's trade secret information for its own benefit.

Through Undertone, Perion acquired Adtile's trade secrets.  Based on Adtile's letters written to Undertone prior to its acquisition, Perion knew or had reason to know that Undertone's acquisition and use of Adtile's trade secret information was through improper means and in breach of the parties' agreements.  *See McKesson Automation, Inc. v. Swisslog Holding AG*, No. 06-28-SLR-LPS, 2009 U.S. Dist. LEXIS 103665, at *123 (D. Del. Oct. 30, 2009) (holding that receipt of cease and desist letter gave defendant actual knowledge of alleged infringement).

Defendants had a duty not to use or disclose Adtile's trade secret information, and their failure to do so makes it highly likely that Adtile will succeed on its misappropriation of trade secrets claim.

### (b)      Common Law Misappropriation of Confidential Information

Defendants also misappropriated Adtile's confidential information.   A claim of misappropriation of confidential information requires consideration of whether:   (1) the information was generally available to the public, (2) the defendant would have been aware of the information if not for its relationship with plaintiff, (3) the information gave defendant a competitive advantage vis-à -vis plaintiff, and (4) the defendant knew that plaintiff had an interest in protecting the information to preserve its own competitive advantage.  *Thomas & Betts Corp. v. Richards Mfg. Co.*, 342 F. App'x 754, 759 (3d Cir. 2009).

Here, Adtile's confidential information was not generally available to the public, and Defendants would not have known the confidential information but for the obligations agreed

-13-

upon pursuant to Undertone's License Agreement and NDA with Adtile.  Defendants knew that Adtile had an interest in protecting this information, as evidenced by the License Agreement and NDA, as well as common sense:  any company that has rolled out a revolutionary new product would want to keep the know-how required for its development secret.  Adtile's confidential information gives Defendants a competitive advantage because they can now develop motion-activated ads exponentially faster than they would have without this information, allowing them to reap the benefits of Adtile's hard work in developing the technology without doing any leg work themselves.   For these reasons, Adtile is also likely to prevail on its claim of misappropriation of confidential information.

### (c)        Copyright Infringement

Defendants display, publish, and distribute motion-activated ads that prominently incorporate Adtile's "handphone" image and Full Tilt Library software, thereby resulting in copyright infringement.   Two elements must be proven to establish a claim for copyright infringement:  (i) ownership of the copyright in the work in question; and (ii) copying of original elements of that work.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

Adtile is the owner of a U.S. copyright registration for its "handphone" image and its Full Tilt Library software.  *See* Certificate of Registration No. VA-1-959-683 and No. TX-8-068-504, Forsblom Decl. ¶ 21, Exhs. F & H.  These certificates are "prima facie evidence of the validity of the copyrights and of the facts stated in the certificate," including Adtile's ownership of the copyrights.  17 U.S.C. § 410(c); *Blendingwell Music, Inc. v. Moor-Law, Inc.*, 612 F. Supp. 474, 480 (D. Del. 1985) ("the certificates of copyright are sufficient to shift the burden of proof to the defendant to disprove proprietorship").

An inference of copying arises from proof of access and substantial similarity.  *Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1231-32 (3d Cir. 1986).  Undertone plainly

-14-

had access to the "handphone" image, as it was authorized to use the image by the License Agreement before such agreement and authorization were terminated.  Forsblom Decl. ¶ 29. And, as shown from a side-by-side comparison of screen shots of Undertone ads and Adtile ads (Lippetz Decl. ¶ 6), given the substantial similarity between the works, copying is too plain to be denied:

**Screen from Adtile Ad**



**Screen from Undertone Ad**



Undertone also had access to the Full Tilt Library software, which was publicly available, and Adtile's analysis of Undertone's ads revealed that the source code for such ads copy the copyrighted software.  Forsblom Decl. ¶ 54.

Undertone's acts of display, reproduction and distribution of Adtile's "handphone" image and Full Tilt Library, and its preparation of derivative works therefrom, constitute an infringement of Adtile's copyright.  17 U.S.C. § 106.  Such infringing use of a copyright after the signing of a termination agreement is conduct that courts have found actionable and meriting an injunction.  *See, e.g., AMC Tech. L.L.C. v. SAP AG*, 78 U.S.P.Q.2d 1834, 1846, 2005 U.S. Dist. LEXIS 27095, at *31, 41-42 (E.D. Pa. Nov. 3, 2005) (granting preliminary injunction on contributory copyright claim where defendant distributed licensed software to customers in violation of the termination agreement).

**(d)      False Designation of Origin and Unfair Competition**

By using Adtile's "handphone" trademark in connection with the sale of motion-activated ads and representing that these ads were created by Undertone alone, Defendants are

-15-

misrepresenting and falsely describing to the general public and others the origin, sponsorship, or approval of their mobile ads, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  To prove a claim of false designation of origin or unfair competition under the Lanham Act, the plaintiff must show:  (1) that the defendant uses a false designation of origin; (2) that such use of a false designation of origin occurs in interstate commerce in connection with goods or services; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of the plaintiff's goods and services by another person; and (4) that the plaintiff has been or is likely to be damaged.  15 U.S.C. § 1125(a)(1)(A); *see AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1428 (3d Cir. 1994).

Here, Defendants are attempting to take all the credit for Adtile's hard work.  Even before the termination of the parties' License Agreement, Undertone falsely represented in a video blog post that the Nestlé Perrier Motion Ad created by Adtile was Undertone's alone.  This false representation was certain to deceive viewers as to the source of the ad and to damage Adtile's reputation.  Undertone also accepted an award for an Adtile Motion Ad without giving Adtile any credit, again causing confusion as to the origin of Adtile's Motion Ads.

Moreover, Defendants' false designation of origin is demonstrated by its use of Adtile's "handphone" mark as a source indicator.  Such false designation of origin occurs in interstate commerce in connection with Defendants' copycat ads.  Undertone's "handphone" mark is identical to Adtile's "handphone" mark.  As such, the false designation of origin is likely to cause confusion or mistake as to the origin of Undertone's ads or approval of the ads by Adtile. [2]

---

[2] There is a high likelihood of confusion here because, *inter alia*, Undertone's "handphone" image is identical to Adtile's "handphone" image; the parties' marks are used in connection with the same types of products and offered in the same trade channels; and Undertone knowingly adopted its identical mark in an attempt to deceive consumers.  *See AT&T*, 42 F.3d at 1442-43.

Not only is such confusion likely, but actual confusion has already resulted from Undertone's conduct.  Forsblom Decl. ¶ 53.  Adtile is likely to be damaged by these false designations of origin because Defendants' ads are inferior to Adtile's, and viewers may wrongly attribute the lower-quality ads to Adtile.  *Id.* at ¶ 67.  Furthermore, Defendants are harming Adtile's reputation and its goodwill in the "handphone" image and Motion Marks.  *Id.* at ¶ 65.

### 2. Adtile Is Threatened With Irreparable Harm.

Adtile faces imminent, irreparable harm based on Defendants' continuing acts of misappropriation and infringement.  To establish irreparable harm, a plaintiff must demonstrate that the harm is "actual" and "imminent."  *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 858 (3d Cir. 1986).  Irreparable harm is defined as an injury that "cannot be redressed following trial."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 595 (3d Cir. 2002).

Allowing Defendants to continue their misappropriation and infringing conduct any longer would be a grave injustice that would be extremely difficult to compensate with a future monetary award.  For example, Adtile's market share, profits, and the premium price it commands for its Motion Ad products are being eroded by Undertone's production of motion-activated ads.  *See Research Found. of State Univ. of N.Y. v. Mylan Pharms., Inc*., 723 F. Supp. 2d 638, 658 (D. Del. 2010) ("Depending on circumstances, evidence of price erosion, loss of market share, loss of profits . . . may constitute irreparable harm").  Adtile is losing the opportunity to develop its client base that is attracted to its unique proprietary technology by Defendants' use of and claim of ownership in the technology, as well as to command a certain price and receive returns for this technology.

Furthermore, Defendants' unfair competition and conduct that is damaging Adtile's goodwill and reputation will cause Adtile irreparable harm.  *See CryoLife, Inc. v. CR Bard, Inc.,*

-17-

*et al.*, No. 14-559-SLR, 2015 U.S. Dist. LEXIS 29460 at *8-9 (D. Del. Mar. 10, 2015) (granting preliminary injunction and finding irreparable harm where the plaintiff "made persuasive arguments for the loss of its customer base and damage to its goodwill"); *Groupe SEB U.S., Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205, 207 (3d Cir. 2014) (affirming grant of preliminary injunction and finding of irreparable harm where the record contained sufficient evidence of likely harm to plaintiff's brand reputation and goodwill). Indeed, every day that Defendants continue to produce motion-activated ads using Adtile's confidential and trade secret information, copyrights and trademark, Adtile loses more of its hard-earned status, reputation, and market share as the developer of revolutionary Motion Ad technology. Forsblom Decl. ¶ 68.

For a claim of trade secret misappropriation, injunctive relief is explicitly authorized by statute. [3] And courts routinely grant preliminary injunctive relief to prevent the further misappropriation of trade secrets. *See, e.g., Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982) (affirming preliminary injunction on trade secrets claim); *Air Prods. & Chem*, 2003 U.S. Dist. LEXIS 23985, at *38 (granting preliminary injunction on trade secrets claim). For copyright and false designation of origin, the statutes also explicitly provide for injunctive relief against infringement. 17 U.S.C. § 502(a) (Copyright); 15 U.S.C. § 1116(a) (False Designation of Origin).

### 3.     The Balance Of Hardships Favors Injunctive Relief.

The hardship to Adtile is plain if injunctive relief is not granted: Adtile stands to lose significant revenues, a stellar reputation as a technology innovator, and substantial market share. Defendants' actions are destroying Adtile's first-to-market advantage by "leapfrogging"

---

[3] 6 Del. C. § 2002(a) provides: "Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."

themselves into the position of having a competing product at the same time as Adtile.  Forsblom Decl. ¶¶ 66, 68.

Moreover, any hardship claimed by Defendants in losing sales of a misappropriated and infringing product is greatly outweighed by the injury that would come to Adtile if the injunction were not granted.  *See Home Line Furniture Indus.*, 630 F. Supp. 2d at 542 (holding plaintiff that "spent more time and resources developing its program [ ] will suffer a greater injury" than defendant, which developed its program using plaintiff's proprietary information).  Defendants can operate their business without selling motion-activated ads, and "an injunction does no more than restore the *status quo* as it existed prior to the alleged wrongful acts."  *Air Prods. & Chem*, 2003 U.S. Dist. LEXIS 23985, at *40 (citation omitted).

### 4.    The Public Interest Favors Grant Of A Preliminary Injunction.

There is a "generalized public interest in 'upholding the inviolability of trade secrets and enforceability of confidentiality agreements.'"  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010) (citation omitted).  As such, the public interest favors the grant of a preliminary injunction to hold Defendants to their duty to keep Adtile's trade secret and confidential information secret and preclude Defendants from unlawfully taking advantage of this information.

The public interest also favors granting an injunction against Defendants' copyright infringement, in order to protect the skills, creative energies, and resources Adtile invested in creating its copyrighted works.  *See Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (reversing denial of preliminary injunction and noting that "it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work") (citation omitted).

-19-

### 5.      The Bond Should Be Excused or Set at a Nominal Amount.

Because Adtile is likely to succeed on the merits of this case and the balance of hardships weighs heavily in its favor, the bond requirement should be excused, or the bond set at a nominal amount.   The amount of bond required on a preliminary injunction is within the Court's discretion and should be set at the sum the Court deems proper for payment of the costs and damages "sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Court should waive the bond requirement here, or grant a nominal bond, because Adtile has shown that Defendants knowingly took the risk of infringing Adtile's copyrights and trademarks and misappropriating Adtile's trade secret and confidential information.  Furthermore, Adtile is a small, private company; whereas Defendants are large companies:  Perion is publicly traded, with 2014 annual revenue of $394 million, and Undertone was just purchased for $180 million.  Lippetz Decl. ¶ 5.  Therefore, the balance of hardships favors waiver of the bond requirement.  Accordingly, Adtile respectfully requests that the Court excuse the bond requirement or set the bond in an amount of $5,000.

## IV.      <u>CONCLUSION</u>

For the foregoing reasons, a preliminary injunction should issue on the terms of the proposed order that is being filed and served herewith.

MORRIS NICHOLS ARSHT & TUNNELL LLP


*/s/ Donald E. Reid*
Donald E. Reid (#1058)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
302.351.9219
dreid@mnat.com

*Attorneys for Plaintiff*
*Adtile Technologies Inc.*

OF COUNSEL:

Greg L. Lippetz (Bar No. 154228)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
650.739.3968
glippetz@jonesday.com

February 3, 2016
Redacted Filing Date:  February 5, 2016